J-M03001-24

2024 PA Super 142

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES R. MILLER, JR. | : | |
| | : | |
| Petitioner | : | No. 30 WDM 2024 |

Appeal from the Order Entered April 3, 2024
In the Court of Common Pleas of Westmoreland County
Criminal Division at No.:  CP-65-CR-0001019-2024

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and LANE, J.

OPINION BY LAZARUS, P.J.:                              **FILED: JULY 11, 2024**

Petitioner, James R. Miller, Jr., filed a "Petition for Specialized Review" ("Petition"), seeking review of the April 3, 2024 order of the Court of Common Pleas of Westmoreland County, which granted the Commonwealth's petition to modify bail and, consequently, revoked Petitioner's bail.  Upon review, we affirm.

The facts of this case are undisputed and, unless otherwise specified, are derived from the trial court's May 16, 2024 "Statement of the Court Issued Pursuant to Pa.R.A.P. 1762(e)" ("Trial Court Opinion").  **See** Trial Court Opinion, 5/16/24, at 1-10.  As a result of a nighttime shooting incident that occurred on January 28, 2024, Petitioner was charged with discharge of a firearm into an occupied structure, and two counts of recklessly endangering

another person ("REAP") on January 31, 2024.[1]  Following arraignment, bail was set at $500,000.00.  On March 4, 2024, Petitioner filed a motion to modify bail.

On March 6, 2024, the day a hearing on Petitioner's motion was scheduled, the Commonwealth withdrew the original charges, and substituted them with the following:  two counts of attempted homicide, several counts of aggravated assault, two counts of assault of a law enforcement officer – firearm discharged, several counts of simple assault, discharge of firearm into an occupied structure, three counts of REAP, and possession of drug paraphernalia.[2]

At the March 6, 2024 hearing, the Commonwealth indicated on the record that it was "looking for either no bond or a high monetary bond."  N.T., Hearing, 3/6/24, at 40.  The Commonwealth further stated that "the bond was set properly on the prior charges at $500,000.00."  *Id.*  Despite the new charges, including attempted homicide of two police officers, the Commonwealth repeated that either "no bond be set," given the danger Petitioner posed to himself and the community, or "a high bond be set for $500,000.00." *Id.* at 40-41.  At the conclusion of the hearing, the Magisterial

---

[1] 18 Pa.C.S.A. §§ 2707.1(a) and 2705.

[2] 18 Pa.C.S.A. §§ 901(a), 2702(a)(1), (2), (6), 2702.1.(a)(1), 2701(a)(1), (3), 2707.1(a), and 2705; and 35 P.S. § 780-113(a)(32), respectively.

District Judge kept Petitioner's bond at $500,000.00. Petitioner thereafter posted the bond and was released from prison.

On March 27, 2024, the Commonwealth filed a petition to modify bail, requesting that Petitioner be held without bond given the nature of the charges and the alleged facts and circumstances of the case. On April 3, 2024, the trial court conducted a hearing on the petition, at which the Commonwealth presented testimony and evidence from two police officers who were involved in the January 28, 2024 shooting incident.

The Commonwealth first called to the stand State Trooper Brandon Gelet, who testified that, at approximately 9:30 p.m. on January 28, 2024, he responded to a report of approximately five to six shots fired. Upon arriving at the location, Trooper Gelet was informed that individuals heard shots being fired outside and one of the rounds hit a house. A bullet hole was located in the attic of a residence. Based on the trajectory of the bullet hole, Trooper Gelet determined the general direction from where the bullet could have originated. During the canvassing of the neighborhood that ensued, Trooper Gelet knocked multiple times on the front door of a residence, but there was no answer. His colleague, Trooper Smith, went to the right side of the residence by the yard area. Trooper Gelet went to the left side of the residence and did not see any lights on. Trooper Gelet again knocked on the door and observed a small dog go through a door and begin to bark.

At the time, attired in their Pennsylvania State Police uniforms, both troopers had arrived in their marked police vehicles with activated lights.

Trooper Gelet shone his flashlight through the porch to determine if he could see anyone. According to Trooper Gelet's testimony, he observed an AR rifle on a counter and informed Trooper Smith about it. Trooper Gelet also observed a "Ring" doorbell on a windowsill pointed towards his waist. He grabbed the doorbell, positioned the camera toward his face, and pressed the button to activate it.

Moments later, Trooper Gelet observed lights turn on in the same room where the AR rifle was located. He observed an individual, later identified as Petitioner, walking aggressively at a fast rate and going directly for the AR rifle. Trooper Gelet immediately informed Trooper Smith about what was happening and yelled for Petitioner to drop the weapon. Trooper Gelet testified that Petitioner started moving toward the troopers through the doorway area. The troopers retreated into the yard with their pistols drawn while continuously yelling for Petitioner to drop the weapon.

According to Trooper Gelet, Petitioner did not drop the weapon and instead went through the front door. Petitioner immediately fired two rounds directly in front of himself, holding the rifle in the hip-firing position. The troopers continued to instruct Petitioner to drop his weapon. Petitioner did not comply. Instead, Petitioner started turning toward the troopers, at which point they fired at him. Trooper Gelet observed Petitioner fall to the ground without the rifle in his hands. Petitioner was struck in the abdominal area.

The Commonwealth next presented the testimony of Corporal Jeffrey Summits of the Pennsylvania State Police. Corporal Summits testified that he

served as the lead investigator of the officer-involved shooting. According to Corporal Summits, he discovered threatening text messages on Petitioner's cell phone that were made in the evening hours leading up to the incident. Specifically, the messages were sent from Petitioner's cell phone to John McKelvey and Sarah Egbert, stating that he was coming for them, "bringing hell" with him, and threatening to kill them. In addition, Petitioner texted Ms. Egbert, stating that if he "was a female, he would kill her too." Petitioner also sent to Mr. McKelvey and Ms. Egbert a picture of himself posing with an AR-style rifle that was consistent with the rifle that was used in the shooting incident.

Separately, Corporal Summits testified that, during the course of his investigation, he learned that Petitioner was at the Sons and Daughters of Italy Club in Scottsdale prior to the incident. There, Petitioner was irate, yelling, stomping his feet on the ground, and stating that he was going to harm someone.

Herbert Mitchell, III, who works as an agent for a surety bail company in Westmoreland County, testified on Petitioner's behalf. Additionally, defense counsel described Petitioner's medical condition for the court, highlighting the fact that Petitioner was shot six times and is largely confined to a wheelchair. *See* N.T. Hearing, 4/3/24, at 79 (Petitioner is "currently in a wheelchair").

At the conclusion of the hearing, and based on the evidence presented by the Commonwealth, the trial court granted the Commonwealth's petition for bail modification, revoking bail.

On April 17, 2024, Petitioner filed a motion for reconsideration, asserting that the Commonwealth failed to disclose exculpatory evidence. Specifically, Petitioner claimed that, on August 31, 2022, Petitioner was the target of an attempted homicide perpetrated by Orlando Holt, Kristin Kruell, and Tammy Vrable, and that Mr. McKelvey was a friend of Petitioner, who assisted Petitioner in that altercation. Further, Petitioner asserted that he had an opportunity to shoot Mr. Holt, but he declined to do so. Petitioner asserted that he was the Commonwealth's witness in the Holt and Kruell cases. According to Petitioner, both Mr. Holt and Ms. Kruell are incarcerated in the same prison as Petitioner.

On April 19, 2024, the trial court denied Petitioner's reconsideration motion. In so doing, the court found:

1. The August 31, 2022 incident involving [Petitioner], [Mr.] McKelvey, [Mr.] Holt, [Ms.] Kruell, and [Ms.] Vrabel would have been within the knowledge of [Petitioner], who attended the April 3, 2024 bond hearing, and he would have had the opportunity to elicit testimony about that incident at the bond modification hearing regardless of whether the Commonwealth had submitted that information prior to the bond hearing.

2. While the additional information could provide some insight into [Petitioner's] motivation on January 28, 2024, it would not change the fact that the court has grave concerns regarding [Petitioner's] mental health and state of mind that, without some type of assurance of safety from a mental health professional, would preclude the issuance of a bond in this matter.

Trial Court Order, 4/19/24 (footnote and unnecessary capitalization omitted).

On May 3, 2024, Petitioner filed the instant Petition under Pa.R.A.P. 1610,[3] presenting three issues for our review:

[I.] Whether the Pennsylvania Constitution supports the trial court's decision to revoke Petitioner's bail?

[II.] Whether the trial court erred in failing to consider exculpatory evidence?

[III.] Whether the trial court's decision is supported by evidence?

Petition, at 4 (unpaginated). Petitioner principally challenges the revocation of bail. The Commonwealth did not file a response.

At the outset, we observe that, in light of our Supreme Court's recent decision in **N.E.M.**, 311 A.3d 1088 (Pa. 2024), wherein the Court held that this Court "lacks discretion to decide whether to grant or deny these petitions for specialized review," review of the merits of the instant Petition is now mandatory. **N.E.M.**, 311 A.3d at 1101. We recognize that, although **N.E.M.** addressed petitions for specialized review under Pa.R.A.P. 1612, relating to juvenile out-of-home placement, its rationale is equally applicable to petitions for specialized review of bail filed under Rule 1610. The Court explained that, unlike Chapter 13 of our Rules of Appellate Procedure, which governs interlocutory appeals by permission, Chapter 16—where Rule 1610 is housed—evidences a "mandatory nature" for petitions for specialized review

---

[3] Rule 1610 provides in relevant part, "[w]here the trial court enters an order under Pa.R.A.P. 1762(b) granting or denying release or modifying the conditions of release before sentence, a party may seek review of that order by filing a petition for specialized review in the appellate court that would have jurisdiction over the appeal from the judgment of sentence." Pa.R.A.P. 1610.

and provides a "procedure for appellate review of certain discrete issues." *Id.* at 1099 (citation omitted). The Court further explained that Pa.R.A.P. 1601 "controls how appellate review will be afforded, not how a party can seek permission to appeal." *Id.* The Court remarked that the "separation of appeals placed in Chapter 16 from the permissive appeals consigned to Chapter 13 was intentional. Had we intended the review afforded by Appellate Rule 1612 to be discretionary, it would have been placed in Chapter 13." *Id.* Thus, we now turn to the merits of the instant Petition.

Generally, this Court reviews orders denying bail for an abuse of discretion, reversing only where the trial court misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record shows that its decision is a result of partiality, prejudice, bias, or ill will. *See Commonwealth v. Bishop*, 829 A.2d 1170, 1172 (Pa. Super. 2003). Moreover, this Court's scope of review from the denial of bail is limited to the record evidence adduced at the bail hearing and the findings of the lower court, reviewed in the light most favorable to the prevailing party. *Commonwealth v. Talley*, 265 A.3d 485, 527 (Pa. 2021). This Court will affirm the trial court's denial of bail "if [the court's] factual findings are supported by competent evidence of record, and [its] legal conclusions drawn therefrom are correct." *Id.*

The right to bail,[4] with certain exceptions, is enshrined in Article I, Section 14 of the Pennsylvania Constitution, which provides in pertinent part:

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or **unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great**[.]

Pa. Const. art. I, § 14 (emphasis added).

Rule 520 of the Pennsylvania Rules of Criminal Procedure provides that "[b]ail before verdict shall be set in all cases as permitted by law.  Whenever bail is refused, the bail authority shall state in writing or on the record the reasons for that determination."  Pa.R.Crim.P. 520(A).

In **Talley**, our Supreme Court conducted a thorough analysis of a defendant's right to bail pursuant to Article I Section 14 of the Pennsylvania Constitution.  The Court concluded:

> [A] trial court may deny bail under Article I Section 14 when the Commonwealth's proffered evidence makes it substantially more likely than not that the accused:  (1) committed a capital offense, (2) committed an offense that carries a maximum sentence of life imprisonment, or **(3) presents a danger to any person and the community, which cannot be abated using any available bail conditions.**  That determination requires a qualitative assessment of the Commonwealth's case.

---

[4] The fundamental purpose of bail is to ensure the accused's presence at trial. **Talley**, 265 A.3d at 515, n.18; **see** Pa.R.Crim.P. 103 (defining bail as "the security or other guarantee required and given for the release of a person, conditioned upon a written undertaking, in the form of a bail bond, that the person will appear when required and comply with all conditions set forth in the bail bond").

*Talley*, 265 A.3d at 525-26 (emphasis added).  The Court provided a non-exhaustive list of factors a trial court should consider in denying bail, which include:  (1) the defendant's character; (2) relevant behavioral history or past patterns of conduct; (3) the gravity of the charged offense; (4) the conditions of bail reasonably available to the court; and (5) any evidence that tends to show that those conditions would be inadequate to ensure the protection of any person or the community.[5]  *Id.* at 525.  Thus, according to the Court, "[i]f the balance of the evidence is rife with uncertainty, legally is incompetent, requires excessive inferential leaps, or lacks any indicia of credibility, it simply is not evident proof, nor can it give rise to a great presumption, that the accused is not entitled to bail."  *Id.* at 526.

---

[5] These factors either largely mirror or overlap with factors set forth in Pa.R.Crim. 523(A), relating to release criteria.  The Rule 523(A) factors include:  (1) the nature of the offense charged and any mitigating or aggravating factors that may bear upon the likelihood of conviction and possible penalty; (2) the defendant's employment status and history, and financial condition; (3) the nature of the defendant's family relationships; (4) the length and nature of the defendant's residence in the community, and any past residences; (5) the defendant's age, character, reputation, mental condition, and whether addicted to alcohol or drugs; (6) if the defendant has previously been released on bail, whether he or she appeared as required and complied with the conditions of the bail bond; (7) whether the defendant has any record of flight to avoid arrest or prosecution, or of escape or attempted escape; (8) the defendant's prior criminal record; (9) any use of false identification; and (10) any other factors relevant to whether the defendant will appear as required and comply with the conditions of the bail bond.

With the foregoing standard in mind, and for ease of disposition, we combine Petitioner's first and third issues on review.[6]  Petitioner essentially claims that the trial court abused its discretion in revoking his bail.  In support, Petitioner points out that, while released on bail, he was not only present for all court proceedings, but also posed no threat to the community.  ***See*** Petition, at 5-6 (unpaginated).  Additionally, Petitioner claims that to ensure the safety of the community, the trial court had at its disposal "less restrictive measures other than imprisonment—such as house arrest."  ***Id.*** at 6 (unpaginated).  Finally, Petitioner claims that the Commonwealth did not offer any expert testimony sufficient to revoke bail on the basis of Petitioner's mental health.  ***Id.*** at 7 (unpaginated).

Based upon our review of the record, we conclude that the trial court considered multiple factors consistent with ***Talley*** and, as a result, did not abuse its discretion in revoking Petitioner's bail.  The trial court explained on the record that it had no intention of revoking Petitioner's bail prior to the April 3, 2024 hearing.  In fact, the court stated that, because a high bail was set and Petitioner had not caused any trouble since being released on bail, its initial intention was to maintain the status quo.  ***See*** N.T., Hearing, 4/3/24, at 80, 82 (stating that the court's initial thought was house arrest).  However,

_____

[6] To the extent Petitioner claims that the revocation of his bail was unconstitutional under Article I, Section 14 of the Pennsylvania Constitution, ***see*** Petition, at 5-6 (unpaginated), we are unable to engage in a meaningful review of the claim because, beyond a bald allegation of unconstitutionality, Petitioner has failed to develop this claim with any citation to authority.

the trial court further explained that the evidence presented at the hearing raised three "different lines of concern." *Id.* at 80.

First, finding credible Trooper Gelet's testimony, the trial court was concerned by Petitioner's act of shooting in the vicinity of the troopers when they came to his house. *See id.* (noting that Petitioner was shooting in vicinity of troopers and pivoted toward them when they shot him). The trial court's second concern was that prior to the January 28 incident, Petitioner was shooting a gun in public late at night. *Id.* The trial court's final concern pertained to Petitioner's sending threatening messages to Mr. McKelvey and Ms. Egbert. *Id.* at 80-81.

As a result of these concerns, the trial court found that Petitioner posed a safety threat to the community. *Id.* at 81. The trial court reasoned:

> [We are] looking at somebody that certainly that night was completely out of control, and if somebody is that out of control that they're—that somebody comes to their home, they hear a doorbell, and he comes out shooting immediately, what's house arrest—what's home electronic monitoring going to do there?

*Id.* at 82. We agree. Thus, given the unique circumstances of this case, where Petitioner shot a firearm in public and subsequently in the vicinity of uniformed troopers late at night, and viewed in a light most favorable to the Commonwealth as the prevailing party, we cannot conclude that the trial court

abused its discretion in determining that the Commonwealth established, by evident proof and great presumption, that Petitioner was not entitled to bail.[7]

We turn finally to Petitioner's second claim that the trial court erred in failing to consider exculpatory evidence. **See** Petition, at 6 (unpaginated). Petitioner argues that the Commonwealth committed a **Brady**[8] violation in failing to disclose that Petitioner was the target of an attempted homicide on August 31, 2022, when Mr. Holt pointed a firearm at Petitioner and pulled the trigger. **Id.** Additionally, Petitioner argues the Commonwealth did not disclose that Petitioner was a witness for the Commonwealth in those cases and, despite having an opportunity to shoot Mr. Holt, Petitioner declined to do so. **Id.**

Petitioner is not entitled to relief on this issue. As the trial court aptly explained, "it is not clear that said information constitutes **Brady** material, that the Commonwealth was aware of it prior to the hearing, or that it was required to provide exculpatory information at this early stage of the case." Trial Court Order, 4/19/24, at ¶ 1, n.1. Indeed, this information would have been known to Petitioner, who was present at the April 3, 2024 hearing.

---

[7] The trial court acknowledged that expert testimony regarding Petitioner's medical condition or his mental health might have led to a different outcome on the Commonwealth's petition for bail modification. **See** N.T., Hearing, 4/3/24, at 81, 83-84.

[8] **Brady v. Maryland**, 373 U.S. 83 (1963) (holding that a due process violation occurs when the state suppresses or fails to disclose material exculpatory evidence).

Accordingly, in light of the foregoing, and pursuant to **N.E.M.**'s mandate to consider petitions for specialized review on their merits, we affirm the trial court's April 3, 2024 order.

Order affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/11/2024